# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT GREENEVILLE

|  |  |  |
|---|---|---|
| HOLSTON UNITED METHODIST HOME FOR CHILDREN, INC., | ) ) ) | Case No. 2:21-cv-185 |
| *Plaintiff*, | ) ) | Judge Travis R. McDonough |
| v. | ) ) | Magistrate Judge Cynthia R. Wyrick |
| XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*, | ) ) ) ) ) |  |
| *Defendants*. | ) ) |  |

---

## MEMORANDUM OPINION

---

Before the Court is Defendants' motion to dismiss (Doc. 20). This action challenges various actions taken by Defendant United States Department of Health and Human Services ("HHS"). For the following reasons, the Court will **GRANT** the motion (Doc. 20).

## I.     BACKGROUND

### A.     Title IV-E

Federal funding for foster-care programs is available through Title IV-E of the Social Security Act, 42 U.S.C. §§ 670–679c. HHS administers Title IV-E through conditional grants of federal funds to states. 42 U.S.C. §§ 670–679c. Defendant Administration for Children and Families ("ACF") is the division within HHS responsible for administering Title IV-E funds to states to support adoption and foster-care programs. (Doc. 1, at 4.) The State of Tennessee receives funds from the federal government through ACF's administration of Title IV-E. (*Id.* at

11.)  Title IV-E contains no provision regarding antidiscrimination.  *See* 42 U.S.C. §§ 670–679c.

### B.     2016 Grants Rule

In 2014, HHS promulgated a comprehensive regulatory scheme governing the administrative requirements, cost principles, and audit requirements for the federal financial assistance they provide through grants and/or cooperative agreements.  Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 79 Fed. Reg. 75,871-01 (Dec. 19, 2014) [hereinafter the "Comprehensive Grants Rules"].  In 2016, HHS promulgated a rule modifying and adding regulatory language to the Comprehensive Grants Rules to provide additional guidance to regulated entities.  Health and Human Services Grants Regulation, 81 Fed. Reg. 89,393-01 (Dec. 12, 2016) [hereinafter the "2016 Grants Rule"]. The 2016 Grants Rule added the following nondiscrimination language to HHS's grants requirements:

> (c) It is a public policy requirement of HHS that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation. Recipients must comply with this public policy requirement in the administration of programs supported by HHS awards.
>
> (d) In accordance with the Supreme Court decisions in *United States v. Windsor* and in *Obergefell v. Hodges*, all recipients must treat as valid the marriages of same-sex couples. This does not apply to registered domestic partnerships, civil unions or similar formal relationships recognized under state law as something other than a marriage.

*Id.* at 89,395 (formerly codified at 45 C.F.R. § 75.300).  HHS promulgated this regulation pursuant to its statutory authority under 5 U.S.C. § 301, which states, "[t]he head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and

2

the custody, use, and preservation of its records, papers, and property." This statute, however, contains no provision regarding nondiscrimination. *See id.* Instead, the Supreme Court has stated that Section 301 is "a 'housekeeping statute,' authorizing what the Administrative Procedure Act ("APA") terms 'rules of agency organization procedure or practice' as opposed to 'substantive rules.'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 310 (1979).

The 2016 Grants Rule became effective on January 12, 2017, but, on January 20, 2017, the presidential administration changed, resulting in "changes in compliance and enforcement priorities." Health and Human Services Grants Regulation, 86 Fed. Reg. 2,257-01, 2,273 (Jan. 12, 2021) [hereinafter "2021 Grants Rule"]. Therefore, as HHS itself noted in the preamble to a later grants rule, "the Department and its grantmaking agencies did not make, and have not made, any concerted effort to obtain recipient compliance with the nonstatutory nondiscrimination provisions since the 2016 rule became effective and have not taken steps to enforce compliance with such requirements." *Id.*

### i. *Religious Waivers*

HHS allows non-federal entities seeking grants to receive exceptions from the requirements of the Comprehensive Grants Rules on a case-by-case basis, provided there are unusual circumstances and "exceptions are not prohibited by statute." Comprehensive Grants Rules, 79 Fed. Reg. at 75,899 (codified at 45 C.F.R. § 75.102). On February 27, 2018, even though the 2016 Grants Rule was never enforced, South Carolina submitted a request for such an exception from the nondiscrimination requirements of the 2016 Grants Rule. Admin. for Child. and Fams., Re: Withdrawal of Approval of Exception from Religious Non-Discrimination Requirement of 45 CFR 75.300(c) (Nov. 18, 2021), https://www.acf.hhs.gov/sites/default/files/documents/withdrawal-of-exception-from-part-

75.300-south-carolina-11-18-2021.pdf at 2 [hereinafter "South Carolina Letter"]. The request stated that faith-based child-placement agencies were essential to recruiting foster families in the state, and the nondiscrimination requirements of the 2016 Grants Rule placed a substantial burden on faith-based agencies in violation of their rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq. Id.* On January 23, 2019, ACF approved South Carolina's request, excepting it and the child-placement agencies it funds from the nondiscrimination requirements of the 2016 Grants Rule. *Id.* HHS also granted Texas, Michigan, and various foster-care and adoption services in those states exceptions from the 2016 Grants Rule's nondiscrimination requirements on similar bases as South Carolina's exceptions. HHS, HHS Takes Action to Prevent Discrimination and Strengthen Civil Rights (Nov. 18, 2021), https://www.hhs.gov/about/news/2021/11/18/hhs-takes-action-to-prevent-discrimination-and-strengthen-civil-rights.html [hereinafter "November 2021 Press Release"].

### ii. *Notification of Nonenforcement*

Although HHS had not enforced the 2016 Grants Rule since it became effective, on November 19, 2019, HHS published a formal notification in the Federal Register to inform the public that it would not enforce the 2016 Grants Rule after determining that the rulemaking raised "significant concerns about compliance with the Regulatory Flexibility Act ['RFA']." Notification of Nonenforcement of Health and Human Services Grants Regulation, 84 Fed. Reg. 63,809-01, 63,809 (Nov. 19, 2019) [hereinafter "Notification of Nonenforcement"]. HHS announced that it was "exercising its discretion to not enforce the [2016 Grants Rule] with respect to any grantees until the rules have been properly re-promulgated with an impact analysis that hews to the requirements of the RFA." *Id.* at 63,811. At the time HHS published the Notification of Nonenforcement, it also "publishe[d] a notice of proposed rulemaking to begin

the process of repromulgating, as appropriate, these rules." *Id.* at 63,811 n.7.

## C. 2021 Grants Rule and Subsequent Litigation

The repromulgation process resulted in HHS issuing a final rule on January 12, 2021.

2021 Grants Rule, 86 Fed. Reg. 2,257-01.  The 2021 Grants Rule removed the 2016 Grants

Rule's language regarding gender-identity discrimination.  *Id.* at 2,278 (formerly codified at 45

C.F.R. § 75.300).  Instead, the nondiscrimination language in the 2021 Grants Rule only

incorporates protections from other sources of law:

> (c) It is a public policy requirement of HHS that no person otherwise eligible will
> be excluded from participation in, denied the benefits of, or subjected to
> discrimination in the administration of HHS programs and services, to the extent
> doing so is prohibited by federal statute.
>
> (d) HHS will follow all applicable Supreme Court decisions in administering its
> award programs.

*Id.*

Before the 2021 Grants Rule even became effective, its repeal of the 2016 Rule's specific

nondiscrimination language was challenged as violating the APA for being arbitrary and

capricious, an abuse of discretion, or otherwise not in accordance with law.  Complaint, *Facing*

*Foster Care in Alaska v. HHS*, No. 1-21-cv-308 (D.D.C. Feb. 2, 2021), ECF No. 1.  The

plaintiffs in *Facing Foster Care* moved for a temporary restraining order staying the effective

date, enforcement, and implementation of the 2021 Grants Rule.  Plaintiffs' Motion for

Preliminary Injunction, Motion for Temporary Restraining Order, and Motion to Stay, *Facing*

*Foster Care in Alaska v. HHS*, No. 1-21-cv-308 (D.D.C. Feb. 4, 2021), ECF No. 8.  HHS then

conferred with the *Facing Foster Care* plaintiffs, and the parties stipulated to postpone the 2021

Grants Rule's effective date by 180 days to allow the agency time to review the Rule.  Stipulated

Motion to Postpone and Hold in Abeyance, *Facing Foster Care in Alaska v. HHS*, No. 1-21-cv-

308 (D.D.C. Feb. 9, 2021), ECF No. 17.  Through HHS's review process and the litigation, the *Facing Foster Care* court further delayed the 2021 Grants Rule's effective date.  *See generally Facing Foster Care in Alaska v. HHS*, No. 1-21-cv-308 (D.D.C. 2021).

Eventually, HHS completed its review of the Rule, and "concluded that the challenged portions of the rule were not promulgated in compliance with the Administrative Procedure Act." Defendants' Motion for Remand with Vacatur, *Facing Foster Care in Alaska v. HHS*, No. 1-21-cv-308 (D.D.C. June 17, 2022), ECF No. 41, at 3.  Accordingly, HHS voluntarily moved the court to vacate and remand the challenged portions of the 2021 Grants Rule, and the *Facing Foster Care* court granted HHS's motion.  *Id.*; Order Granting Motion to Remand, *Facing Foster Care in Alaska v. HHS*, No. 1-21-cv-308 (D.D.C. June 29, 2022), ECF No. 44.  In its motion to vacate and remand the Rule, HHS represented that "vacating the 2021 Rule's formal repeal of the 2016 Rule will not cause disruption or change the status quo," because the 2016 Rule had never been enforced and HHS stated publicly in the Notification of Nonenforcement that it will not enforce the 2016 Rule without promulgation of a new rule.  Defendants' Motion for Remand with Vacatur, *Facing Foster Care in Alaska v. HHS*, No. 1-21-cv-308 (D.D.C. June 17, 2022), ECF No. 41, at 11.  Therefore, neither the 2016 Grants Rule's nondiscrimination provision nor the 2021 Grants Rule's nondiscrimination provision is in effect, in light of the Notification of Nonenforcement and the *Facing Foster Care* court's vacatur, respectively.

### D. Additional Regulatory Actions

#### i. Rescission of Religious Waivers

On November 18, 2021, during the time HHS was reviewing the 2021 Grants Rule for purposes of the *Facing Foster Care* litigation, it issued a press release and opinion letter to the governor of South Carolina announcing that it would rescind the previous waivers given to South

6

Carolina, Texas, Michigan, and various foster-care and adoption services in those states, from the 2016 Rule's nondiscrimination requirements. South Carolina Letter at 1–2, 5; November 2021 Press Release. In the press release, HHS stated it

> is reestablishing its long-standing Department practice of evaluation of religious exemptions and modifications of program requirements on a case-by-case basis, as needed, and as is required by law—which was unprecedently changed in 2017 by the previous Administration. . . . HHS will not condone the blanket use of religious exemptions against any person or blank checks to allow discrimination against any persons, importantly including LGBTQ+ persons in taxpayer-funded programs.

November 2021 Press Release. While the November 2021 Press Release rejected the use of blanket religious exemptions in favor of case-by-case evaluations, it also recognized that such exemptions were not necessary in the first place because the nondiscrimination requirements of the 2016 Grants Rule were never enforced, and because HHS had issued the Notice of Nonenforcement instead. *Id.*

In rescinding South Carolina's exception from the nondiscrimination requirements of the 2016 Grants Rule, HHS opined that "Section 75.102(b)," the regulation allowing exceptions to the Comprehensive Grants Rules, "is best read to, and has been historically used to, address requests for exceptions that pertain to financial and administrative management of federal grants, such as deviations from normal allowable costs, requirements applicable to for-profit subrecipients, costs requiring prior approval, or computation of depreciation." South Carolina Letter at 4. HHS further opined that "[u]sing long-standing exception authority in government-wide rules to provide broad exceptions to civil rights or anti-discrimination laws was a novel use of the authority. . . . [and] was improper." *Id.* at 5. HHS concluded that it misapplied RFRA in granting the South Carolina exception because it was an overbroad exception from the nondiscrimination requirements that ordinarily apply to all child-placement agencies in the state

and rely on religious criteria to select prospective foster-care parents. *Id.* The exception, therefore, covered agencies that did not request it, and HHS did not analyze whether the regulations posed a substantial burden on individual agencies' religious exercise as required by RFRA. *Id.* Accordingly, HHS withdrew South Carolina's exception letter, affirming the return to a fact-specific exception inquiry as articulated in the November 2021 Press Release. *Id.* at 7. The South Carolina Letter also specifically noted the exception was not warranted, or necessary, because the nondiscrimination requirements of the 2016 Grants Rule were never enforced and HHS would not enforce them, for the reasons given in the Notification of Nonenforcement. *Id.* at 1, 7.

### ii. Removal of RFRA Delegation from OCR

Three days after issuing the November 2021 Press Release and South Carolina Letter, HHS published a notice in the Federal Register stating that the Secretary of HHS withdrew the delegation of authority to its Office of Civil Rights ("OCR") with respect to enforcing or complying with RFRA and the First Amendment. Delegation of Authority, 86 Fed. Reg. 67,067-01, 67,067 (Nov. 24, 2021) [hereinafter "Delegation Notice"]. The Secretary of HHS rather than OCR delegated the authority to enforce and comply with RFRA and the First Amendment to the various "Department components" responsible for administering specific HHS programs, such as ACF with respect to foster-care and adoption grantmaking. *Id.* The Delegation Notice also specified that the Department components must consult with the Office of General Counsel ("OGC") to ensure full compliance with RFRA and constitutional requirements. *Id.* Consistent with the November 2021 Press Release and South Carolina letter, which reestablished fact-specific, case-by-case evaluations of religious exemptions, HHS justified the withdrawal of OCR's delegation by stating, "[d]epartment components have the greatest knowledge about their

respective programs and are best able to determine whether the Department has a compelling interest in a particular action and whether less restrictive means are available to further that interest, critical aspects of the legal test under RFRA." *Id.* HHS also reasoned that "[d]epartment components, further, are best situated to craft exemptions or other modifications when required under RFRA and to monitor the impact of such exemptions or modifications on programs and those they serve." *Id.*

### iii. *Executive Order 14,075*

On June 15, 2022, President Biden issued an executive order stating that it is "the policy of my Administration to combat unlawful discrimination and eliminate disparities that harm LGBTQI+ individuals and their families, defend their rights and safety, and pursue a comprehensive approach to delivering the full promise of equality for LGBTQI+ individuals . . . ." Exec. Order No. 14,075, Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals, 87 Fed. Reg. 37,189, 37,189 (June 21, 2022) [hereinafter the "Executive Order"]. Part of the Executive Order directed the Secretary of HHS to consider how to use the Department's authorities to strengthen non-discrimination protections for lesbian, gay, bisexual, transgender, queer, and intersex ("LGBTQI+") individuals in the child-welfare system:

Sec. 5. Addressing Discrimination and Barriers Faced by LGBTQI+ Children, Youth, Parents, Caretakers, and Families in the Child Welfare System and Juvenile Justice Systems. (a) The Secretary of HHS shall consider how to use the Department's authorities to strengthen non-discrimination protections on the basis of sex, including sexual orientation, gender identity, and sex characteristics, in its programs and services, consistent with Executive Order 13988 and applicable legal requirements.
    (b) The Secretary of HHS shall direct the Assistant Secretary for Family Support to establish an initiative to partner with State child welfare agencies to help address and eliminate disparities in the child welfare system experienced by LGBTQI+ children, parents, and caregivers, including: the over-representation of LGBTQI+ youth in the child welfare system, including over-representation in congregate placements; disproportionately high rates of abuse, and placements in unsupportive or

hostile environments faced by LGBTQI+ youth in foster care; disproportionately high rates of homelessness faced by LGBTQI+ youth who exit foster care; and discrimination faced by LGBTQI+ parents, kin, and foster and adoptive families. The initiative, as appropriate and consistent with applicable law, shall also take actions to:

(i)     seek funding opportunities for programs and services that improve outcomes for LGBTQI+ children in the child welfare system;

(ii)    provide increased training and technical assistance to State child welfare agencies and child welfare personnel on promising practices to support LGBTQI+ youth in foster care and LGBTQI+ parents and caregivers;

(iii)   develop sample policies for supporting LGBTQI+ children, parents, and caregivers in the child welfare system;

(iv)    promote equity and inclusion for LGBTQI+ foster and adoptive parents in their interactions with the child welfare system;

(v)     evaluate the rate of child removals from LGBTQI+ families of origin, in particular families that include LGBTQI+ women of color, and develop proposals to address any disproportionate rates of child removals faced by such families;

(vi)    assess and improve the responsible collection and use of data on sexual orientation and gender identity in the child welfare system to measure and address inequities faced by LGBTQI+ children, parents, and caregivers, while safeguarding the privacy, safety, and civil rights of LGBTQI+ youth; and

(vii)   advance policies that help to prevent the placement of LGBTQI+ youth in foster and congregate care environments that will be hostile to their gender identity or sexual orientation.

*Id.* at 37,191.

### E.     Holston Home

Plaintiff Holston United Methodist Home for Children ("Holston Home") is a Tennessee-based not-for-profit corporation that cares for children whose parents cannot currently care for them and eventually either reunites the children with family, places the children up for adoption, or helps transition the children to adulthood.  (Doc. 1, at 3, 5.)  Holston Home is affiliated with the Holston Conference of the United Methodist Church, and its board of directors is composed of religious individuals who are involved with their churches, including two reverends and a bishop.  (*Id.* at 5.)  Holston Home alleges that its "religious beliefs motivate and permeate its

mission and all of its activities." (*Id.*)  Holston Home requires prospective foster and adoptive parents to affirm a Christian statement of faith and beliefs before they can engage in child-placement activities.  (*Id.* at 6.)  Further, Holston Home does not place children with foster or adoptive parents who are in same-sex relationships or unmarried couples of any biological sex who are romantically cohabitating.  (*Id.*)

Tennessee receives federal funds from HHS under Title IV-E, and the state disburses its Title IV-E funds, in part, to Holston Home.  (*Id.* at 11.)  Holston Home alleges that it relies on these federal funds to sustain its child-placement activities.  (*Id.*)

### F.      The Claims

Holston Home initiated this action on December 2, 2021, asserting claims that the 2016 Grants Rule:  (1) violates the APA, 5 U.S.C. § 500, *et seq*., (2) violates Holston Home's rights under RFRA, (3) violates Holston Home's First Amendment right to free exercise of religion, (4) imposes unconstitutional conditions on the distribution of Title IV-E funds in violation of Holston Home's First Amendment right to free speech, and (5) violates Holston Home's First Amendment right to free association.  (Doc. 1, at 16–29.)  Defendants moved to dismiss this case, contending that "Plaintiff [] cannot establish either that it has suffered any injury in fact to support standing or that its claims are ripe for adjudication."  (Doc. 21, at 6.)

## II.      STANDARD OF REVIEW

The case-or-controversy requirement of Article III, Section 2 mandates that a plaintiff have standing in order to sue.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Daunt v. Benson*, 956 F.3d 396, 417 (6th Cir. 2020) (quoting *Spokeo, Inc. v. Robins*,

578 U.S. 330, 338 (2016)).  An injury, for standing purposes, means the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent.'"  *Id.* (quoting *Lujan*, 504 U.S. at 560).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).  A "concrete" injury in fact does not have to be tangible, but it must be "'real,' and not 'abstract.'"  *Id.* at 340.  Further, "[w]here plaintiffs seek to establish standing based on an imminent injury, the Supreme Court has explained 'that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient.'"  *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original)).

The plaintiff bears the burden of showing that standing exists.  *Id.* at 387 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  When a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element of standing.  *See Spokeo*, 578 U.S. at 338 (citing *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  In a pre-enforcement suit, "a plaintiff satisfies the injury-in-fact requirement [of the standing inquiry] where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but [arguably] proscribed by a statute, and there exists a credible threat of prosecution thereunder.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979)).

## III.    ANALYSIS

### A.    Intention to Engage in Conduct Affected with a Constitutional Interest

In this case, Holston Home has alleged an intention to continue to use Title IV-E funds to place children only with families who affirm a Christian statement of faith and to refuse to place

children with same-sex couples or unmarried-but-cohabiting couples. (Doc. 1, at 6.) Holston Home has also alleged that this course of conduct is "arguably affected with a constitutional interest," namely, free exercise of religion and freedom of speech and association. (Doc. 1, at 16–29.) Although Holston Home also brings an APA claim, its "other claims are affected with a constitutional interest too, regardless of the precise legal theory" because it intends to engage in arguably protected *conduct*. *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1138 (D.N.D. 2021) (quoting *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019)); *see also Susan B. Anthony List*, 573 U.S. at 161; *United States v. Ali*, 682 F.3d 705, 709 (8th Cir. 2012) (explaining that the RFRA safeguards First Amendment free-exercise rights).

### B. Whether the Intended Course of Conduct is Proscribed by Statute

Holston Home alleges that its refusal to place children with same-sex couples or families who do not affirm its Christian statement of faith is proscribed by the nondiscrimination provisions of the 2016 Grants Rule, as promulgated under 5 U.S.C. § 301. (Doc. 1, at 12); 86 Fed. Reg. at 2,278 (formerly codified at 45 C.F.R. § 75.300(c)–(d)). HHS does not dispute that such a course of conduct would have been proscribed by the 2016 Grants Rule. (*See* Doc. 21, at 6–9.) Holston Home's child-placement requirements plainly discriminate on the basis of sexual orientation and religion—by refusing to place children with same-sex couples or families who do not affirm Christian faith—and it uses HHS-administered Title IV-E funds to support its child-placement activities. (*See* Doc. 1, at 12.) The 2016 Grants Rule would facially proscribe such conduct: "It is a public policy requirement of HHS that no person otherwise eligible will be . . . subjected to discrimination in the administration of HHS programs and services based on non-merit factors such as age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation." 86 Fed. Reg. at 2,278 (formerly codified at 45 C.F.R. § 75.300(c)).

## C. Whether There Exists a Credible Threat of Prosecution[1]

The remaining salient inquiry, then, is whether Holston Home faces a credible threat of prosecution under the 2016 Grants Rule. *See Susan B. Anthony List*, 573 U.S. at 159. It does not.

In the Sixth Circuit, "[t]he mere *possibility* of prosecution," such as the plaintiff's intended course of action being within the plain text of a non-moribund statute, "does not amount to a 'credible threat' of prosecution. Instead, the threat of prosecution must be *certainly impending* to constitute injury in fact." *Daly v. McGuffey*, No. 21-3266, 2021 WL 7543815, at *2–3 (6th Cir. Nov. 15, 2021) (internal quotation marks omitted) (emphasis original) (quoting *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017)) (citing *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 293 (6th Cir. 1997); *Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 967 (6th Cir. 2009)). The Sixth Circuit applies a factor test, first articulated in *McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016) and known as the "*McKay* factors," to determine whether an alleged threat of prosecution is credible:

> Various factors inform our analysis of whether there is a credible threat of prosecution sufficient to confer standing: (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing

---

[1] Holston Home argues that it has an independent basis to establish pre-enforcement standing because it is the object of the challenged action, and "there is ordinarily little question" that a plaintiff has standing where "the plaintiff is himself an object of the action (or forgone action) at issue." (Doc. 29, at 18); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). Even assuming Holston Home is the object of the 2016 Grants Rule, which is dubious given HHS only grants Title IV-E funds to states rather than to individual child-placement agencies, this doctrine does not establish an *independent* basis for standing. Rather, the Supreme Court has articulated *additional*, rather than independent, guidance to determine whether plaintiffs have standing specifically in pre-enforcement suits affected with a constitutional interest. *See Susan B. Anthony List*, 573 U.S. at 159–61; *Babbitt,* 442 U.S. at 298. Therefore, Holston Home must still establish a credible threat of prosecution under the 2016 Grants Rule, regardless of whether it is the object of the regulation, to demonstrate standing.

any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."

*Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (quoting *McKay*, 823 F.3d at 869). "These *McKay* factors are not exhaustive, nor must each be established," but plaintiffs must "point to some combination" of the factors to demonstrate a credible threat of enforcement. *Id.*; *McKay*, 823 F.3d at 869; *Plunderbund Media, L.L.C v. DeWine*, 753 F. App'x 362, 366, 372 (6th Cir. 2018) (holding that plaintiffs failed to allege a "factual, non-conjectural basis for their fear of prosecution" where plaintiffs did not show a history of enforcement against them, there was no feature of the statute making enforcement easier, and the statute did not clearly apply to plaintiffs); *W.O. v. Beshear*, 459 F. Supp. 3d 833, 841 (E.D. Ky. 2020) (citing *Plunderbund*, 753 F. App'x at 367) (finding plaintiffs lacked standing where, on a motion for preliminary injunction, "even construed in the light most favorable to Plaintiffs, they fail to provide any allegation or point to any evidence which would establish any of these '*McKay* factors.'"); *Block v. Canepa*, No. 20CV-3686, 2021 WL 1909650, at *3 (S.D. Ohio May 12, 2021) ("Courts find a credible threat exists when some combination of these factors are present.").

Holston Home does not allege any history of past enforcement against it or others, nor could it. (*See generally* Doc. 1, at 8–11.) There is absolutely no history of enforcement under the 2016 Grants Rule, because the presidential administration changed eight days after the rule first became effective, resulting in HHS's demurral from *any* enforcement of the 2016 Grants Rule against *anyone* for *any* form of discrimination. *See* 2021 Grants Rule, 86 Fed. Reg. at 2,273. HHS, in its discretion, never sought enforcement of the 2016 Grants Rule, and then, more formally, published the Notification of Nonenforcement in the Federal Register to notify regulated entities that it was "exercising its discretion to not enforce the [2016 Grants Rule] with

15

respect to any grantees until the rules have been properly re-promulgated with an impact analysis that hews to the requirements of the RFA." Notification of Nonenforcement, 84 Fed. Reg. at 63,811. While the presidential administration has once again changed, and this administration's priorities include increased discrimination protections for LGBTQI+ Americans, the current administration has continued not to enforce the 2016 Grants Rule, has not rescinded the Notification of Nonenforcement, and has stated in litigation that HHS would not enforce it. Executive Order, 87 Fed. Reg. at 37,189; Defendants' Motion for Remand with Vacatur, *Facing Foster Care in Alaska v. HHS*, No. 1-21-cv-308 (D.D.C. June 17, 2022), ECF No. 41.

Holston Home also does not allege that HHS has sent any sort of enforcement warning letter to it or to any other child-placement agency pursuant to the never-enforced 2016 Grants Rule. (*See generally* Doc. 1.) Nor does Holston Home allege that there exists an attribute of the 2016 Grants Rule that makes enforcement easier or more likely, such as a citizen-enforcement provision. (*Id.*) Indeed, the administrative enforcement process for the Comprehensive Grants Rules is subject to judicial review and offers many procedural protections, including opportunities to object, review supporting documentation, request a hearing, and appeal. *See* 45 C.F.R. §§ 75.371–75.375; *cf. Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1128–29 (9th Cir. 2009) (finding plaintiffs' claims unripe) ("If HHS initiates compliance proceedings against Plaintiffs based on the 2003 Policy Guidance, Plaintiffs will have an opportunity to challenge the Policy Guidance on the same legal bases on which they rely in the suit now before [the court].").

Finally, not only has Holston Home failed to allege that HHS refuses to disavow enforcement of the 2016 Grants Rule against Holston Home, but HHS has expressly disavowed enforcement of the nondiscrimination provisions of the 2016 Grants Rule against anyone,

including Holston Home, through the Notification of Nonenforcement. 84 Fed. Reg. at 63,809.

Such an express disavowal of enforcement cuts strongly against a finding of standing in this

case. *See McKay*, 823 F.3d at 869. In *Vita Nuova, Inc. v. Azar*, 458 F. Supp. 3d 546 (N.D. Tex.

2020), the Northern District of Texas also considered a challenge to the 2016 Grants Rule, and

the court found that the Notification of Nonenforcement amounted to an express disavowal of

enforcement and that the plaintiffs lacked standing:

> First, Vita Nuova provides no example of former enforcement, and Defendants
> note their history of nonenforcement. Second, the authority to file suit is limited
> to a prosecutor or government agency because Title X deals with federal funds.
> As such, the general public does not have standing to file a grievance. *See
> generally Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).
> Third, Defendants have expressly disavowed enforcement of § 75.300(d). With
> the limited authority to file suit, this means Vita Nuova stands a negligible chance
> of being prosecuted under § 75.300(d). Because there exists little to no credible
> threat of enforcement related to 45 C.F.R. § 75.300(d), Vita Nuova's second
> claim cannot survive Defendants' Motion to Dismiss.

458 F. Supp. 3d at 558. Similarly, the Southern District of Texas found the plaintiffs' claims

moot in *Texas Department of Family & Protective Services v. Azar*, 476 F. Supp. 3d 570 (S.D.

Tex. 2020), in part because "[i]n the nonenforcement notice, HHS unequivocally states that it

will not enforce the challenged provisions pending repromulgation." 476 F. Supp. 3d at 578

(citing 84 Fed. Reg. at 63,811).

Holston Home attempts to escape the conclusion that it lacks standing because HHS

expressly disavowed enforcement of the 2016 Grants Rule by arguing that the Notification of

Nonenforcement "was never a disavowal of enforcement." (Doc. 29, at 17.) This argument is

patently incorrect. As the *Vita Nuova* and *Texas Department of Family & Protective Services*

courts also found, the Notification of Nonenforcement is, in fact, by its very terms, a disavowal

of enforcement. 458 F. Supp. 3d at 558; 476 F. Supp. 3d at 578; Notification of

Nonenforcement, 84 Fed. Reg. at 63,809. It states that the 2016 Grants Rule "will not be

enforced pending a repromulgation that complies with the [Regulatory Flexibility Act]." Holston Home argues that the Notification of Nonenforcement has "dissolved on its own terms" because it is no longer "pending a repromulgation" since HHS repromulgated the rule already with the 2021 Grants Rule but then voluntarily vacated it. (Doc. 29, at 17.) This argument relies wholly on a strained reading of the Notification of Nonenforcement. HHS has not promulgated any effective replacement rule that complies with the Regulatory Flexibility Act, and the 2016 Grants Rule is still "pending repromulgation." *See* Notification of Nonenforcement, 84 Fed. Reg. at 63,809. According to the plain terms of the Notification of Nonenforcement, therefore, HHS's disavowal of enforcement endures in both word and deed.

In the motion HHS submitted to the *Facing Foster Care* court to request voluntary vacatur of the 2021 Grants Rule, it represented that "vacating the 2021 Rule's formal repeal of the 2016 Rule will not cause disruption or change the status quo," because the 2016 Rule had never been enforced and HHS stated publicly in the Notification of Nonenforcement that it will not enforce the 2016 Rule without promulgation of a new rule. Defendants' Motion for Remand with Vacatur, *Facing Foster Care in Alaska v. HHS*, No. 1-21-cv-308 (D.D.C. June 17, 2022), ECF No. 41, at 11. This representation, coupled with the lack of any enforcement actions under the 2016 Grants Rule since vacatur of the 2021 Grants Rule, makes clear that the Notification of Nonenforcement remains in effect as a disavowal of enforcement. Further, even if the Court assumed that the Notification of Nonenforcement was no longer in effect, HHS's "silence" as to whether it would enforce the 2016 Grants Rule against Holston Home still would not amount to a "*refusal* to disavow enforcement." *McKay*, 823 F.3d at 869 (emphasis added); *Thiede v. Burcroff*, No. 16-13650, 2018 WL 465968, at *14 (E.D. Mich. Jan. 18, 2018) ("And he does not credibly allege that Defendants have refused to disavow enforcement of Policy #34. (Contrary to

Plaintiff's assertion [], silence as to enforcement of Policy #34 does not amount to a refusal to disavow enforcement.)") (parenthetical in original).

Holston Home also cites the Executive Order, Delegation Notice, and the recission of religious waivers to support the contention that HHS has not disavowed enforcement of the 2016 Grants Rule and that it faces a credible threat of prosecution.  (Doc. 29, at 25.)  Holston Home states that "[t]he present administration has abandoned repealing the 2016 Grants Rule—and the President is directing that it be enforced."  (*Id.* at 17.)  This mischaracterizes the Executive Order.  The Executive Order simply directs the "Secretary of HHS [to] consider how to use the Department's authorities to strengthen non-discrimination protections on the basis of sex, including sexual orientation, gender identity, and sex characteristics, in its programs and services, consistent with Executive Order 13988 and applicable legal requirements."  87 Fed. Reg. at 37,191.  By no means does the Executive Order direct HHS to enforce the 2016 Grants Rule, or any particular regulation.  *See id.*  Its very terms require that any use of HHS's resources in furtherance of the administration nondiscrimination policy must be within the "Department's authorities" and must comply with "applicable legal requirements."  *Id.*  In the Notification of Nonenforcement, HHS already concluded that the 2016 Grants Rule rulemaking "raise[d] significant concerns about compliance with the Regulatory Flexibility Act," meaning HHS was concerned that the 2016 Grants Rule violated the RFA's legal requirements and was thus outside HHS's authority to promulgate.  Notification of Nonenforcement, 84 Fed. Reg. at 63,809.  Therefore, the Executive Order, by its own terms, did not revive the 2016 Grants Rule either explicitly or implicitly and thus does not represent a credible threat of prosecution.

Finally, HHS's removal of authority from OCR to enforce RFRA and its rescission of religious exemptions also do not raise a credible threat of prosecution.  The South Carolina

Letter and November 2021 Press Release explicitly stated that the exemptions were being

rescinded because they were unnecessary in light of the Notification of Nonenforcement. South

Carolina Letter at 1 ("[T]he non-discrimination provisions in the 2016 Rule that the waiver

issued to South Carolina sought to address are not currently being enforced. Accordingly, the

religious exception South Carolina sought from the 2016 Rule is no longer warranted and, thus,

is hereby rescinded."); November 2021 Press Release ("The Department has determined that

these actions were inappropriate and unnecessary, given that the prior Administration did not

enforce civil rights protections in the first instance in grants and instead issued a Notice of

Nonenforcement for the 2016 Grants Rule."). Further, the Delegation Notice does not prevent

HHS from allowing RFRA exemptions to its programs or render the threat of enforcement to be

more credible; it simply places the authority to grant RFRA exemptions with Department

components rather than OCR, consistent with the agency's return to a fact-specific analysis.

Delegation Notice, 86 Fed. Reg. at 67,067.

If Holston Home means to suggest that the vacatur of the 2021 Grants Rule, the

Executive Order, and the rescission of religious waivers should not be construed by their own

terms, but by political subtext of an unwritten scheme at HHS to begin enforcing the defunct

2016 Grants Rule, the Court could not accept such a suggestion. In assessing whether voluntary

cessation of the allegedly wrongful conduct moots a claim, "[t]he Sixth Circuit has adhered to

the principal that acts of voluntary cessation by government officials are treated with greater

solicitude than similar acts taken by private parties," because courts assume "that

[the government] acts in good faith." *Hooper v. Morkle*, 219 F.R.D. 120, 123 (S.D. Ohio 2003);

*accord Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019) (alteration in original)

(quoting *Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018)); *see also Speech First, Inc.*, 939 F.3d

at 767 ("Namely, we presume that the same allegedly wrongful conduct by the government is unlikely to recur.") (quoting *Friends of the Earth*, 528 U.S. at 189). In this case, HHS disavowed enforcement of the 2016 Grants Rule because it had serious concerns over the rule's compliance with the RFA, and it is entitled to the solicitude that it will act in good faith and abide by the plain terms of its Notification of Nonenforcement rather than revive the allegedly unlawful rule. *See Hooper*, 219 F.R.D. at 123; *Speech First, Inc.*, 939 F.3d at 767.

Because the 2016 Grants Rule is, for all intents and purposes, defunct pursuant to the Notification of Nonenforcement, Holston Home faces no credible threat of prosecution. *See Vita Nuova*, 458 F. Supp. 3d at 558 ("Defendants have expressly disavowed enforcement of § 75.300(d). With the limited authority to file suit, this means Vita Nuova stands a negligible chance of being prosecuted under § 75.300(d)."). Having also failed to show any history of past enforcement of the 2016 Grants Rule, enforcement warning letters, or a feature of the regulation making it easier or more likely to be enforced, Holston Home lacks standing to bring this lawsuit. *See Online Merchs. Guild*, 995 F.3d at 550; *McKay*, 823 F.3d at 869.

## IV.  CONCLUSION

For these reasons, the Court **GRANTS** Defendants' motion to dismiss (Doc. 20). Plaintiffs' claims challenging the 2016 Grants Rule are **DISMISSED WITHOUT PREJUDICE**.[2]

---

[2] "Traditionally, when courts find that [a party] lack[s] standing and therefore must dismiss a case due to lack of subject matter jurisdiction, they dismiss the case without prejudice because they did not reach the merits of the Plaintiff's claim." *Thompson v. Equifax Info. Servs., LLC*, 441 F. Supp. 3d 533, 547 n.7 (E.D. Mich. 2020) (citing *Thompson v. Love's Travel Stops & Country Stores, Inc.*, 748 F. App'x 6, 11 (6th Cir. 2018)).

**AN APPROPRIATE JUDGMENT SHALL ENTER.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**